02-11-095-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00095-CV

 

 


 
 
 Khosrow Sadeghian
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Willie Hudspeth
 
 
  
 
 
 APPELLEE
 
 


 

 

----------

FROM County
Court at Law No. 2 OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

In
seven points, Appellant Khosrow Sadeghian appeals from the trial court’s
judgment awarding Appellee Willie Hudspeth $16,000 on his counterclaims against
Sadeghian and $70,210.53 in sanctions, including $20,210.53 in attorney’s fees. 
Sadeghian challenges the trial court’s jurisdiction over Hudspeth’s
counterclaims and the evidence in support of the judgment.  Because we hold
that part of the trial court’s judgment exceeds its jurisdictional limit, we
modify the judgment in part to exclude the damages awarded for conversion.  But
because we also hold that the trial court had jurisdiction over Hudspeth’s
claims and that the evidence supports the judgment, we affirm the judgment as
modified.

Background

This
suit arose out of a dispute over whether Hudspeth and Sadeghian had a written
contractual agreement under which Hudspeth would perform repairs on Sadeghian’s
property.  Sadeghian sued Hudspeth asserting breach of contract, and Hudspeth
defended the suit on the ground that Sadeghian’s suit was groundless and nothing
more than an attempt to fraudulently force a settlement out of Hudspeth.

Sadeghian
filed his breach of contract suit against Hudspeth in the justice court.  Hudspeth
filed a counterclaim for common law fraud asserting that Sadeghian had made
false and material misrepresentations of fact to Hudspeth and the trial court. 
Hudspeth also sought sanctions under rule 13 of the rules of civil procedure
and chapters 9 and 10 of the civil practice and remedies code,[2]
arguing that Sadeghian’s suit was frivolous, baseless, and groundless and
brought in bad faith as a means to harass Hudspeth.  The jury found for
Hudspeth and found that his attorney’s fees and costs were $4,316, and the
trial court rendered judgment for Hudspeth in that amount.

Sadeghian
then appealed to the county court.  Hudspeth amended his petition, adding a
claim for conversion of personal property.  Hudspeth once again sought
sanctions, including attorney’s fees, under rule 13 and chapters 9 and 10.  Hudspeth
also asserted that in defending against Sadeghian’s suit, he had been forced to
spend time away from work, causing him to lose work worth $6,400.

At
trial, Sadeghian and Hudspeth told very different versions of the events
leading up to the litigation.  Hudspeth testified that had been doing work on
different property owned by a third party and had left materials on the
property for that purpose, but the property was sold at a foreclosure sale to
Sadeghian.  After Sadeghian’s purchase of the property, an employee of
Sadeghian refused to let Hudspeth retrieve the materials.  Sadeghian testified
Hudspeth’s testimony was “not believable at all,” that Hudspeth was lying, and
that he did not see any materials at the property.

The parties
agreed that Sadeghian had asked Hudspeth about doing some repair work on one of
the properties he owned and that Hudspeth gave Sadeghian a bid for the work.  Hudspeth
testified that the bid was for $25,000.  Sadeghian testified that Hudspeth’s
bid was for $17,000, and when asked if the bid had been for $25,000, he asserted
that Hudspeth’s testimony was a lie.  But he later changed his testimony to say
that Hudspeth’s original bid was $25,000 and that he had lowered it to
$17,000.  Both parties agreed that Sadeghian rejected Hudspeth’s bid as too
high.

The
parties disagreed about what happened next.  Hudspeth testified that Sadeghian
asked him to do the work for $8,900, that he declined, and that Sadeghian asked
him if he knew anyone who would do the work for that amount.  Hudspeth gave him
the contact information for Eddie Vasquez, who had done some work for Hudspeth
in the past.

Sadeghian
testified that he only hired Vasquez on the condition that Hudspeth would be
supervising his work, that he gave Hudspeth a handwritten contract obligating
Hudspeth to manage Vasquez’s work for a payment of $200, and that Hudspeth
accepted that offer over the telephone.  Hudspeth testified that he
unequivocally turned down Sadeghian’s handwritten offer but agreed to take
money from Sadeghian to give to Vasquez and that he did so.  Hudspeth also offered
into evidence a written, signed contract that Sadeghian entered into with
Vasquez to perform work on the property.  Sadeghian acknowledged that this
contract made no mention of Hudspeth or of Hudspeth supervising Vasquez’s work.
 But Sadeghian maintained that notwithstanding the terms of his agreement with
Vasquez, Hudspeth had agreed to manage the project under the terms of the
handwritten offer.

Hudspeth
testified that Vasquez and Sadeghian began having disagreements almost as soon
as Vasquez began working on the property and that within three or four days,
Sadeghian kicked Vasquez off the job.  Sadeghian testified that Hudspeth
claimed to have paid Vasquez to purchase materials but that no work was done on
the property and that he never saw any of the items Vasquez supposedly
purchased.

Hudspeth
testified that Sadeghian demanded that Hudspeth pay him the $8,900 that Vasquez
had agreed to do the work for (but most of which Sadeghian acknowledged he had
not paid to Vasquez or anyone else) plus the money that Hudspeth had taken from
Sadeghian and given to Vasquez for materials.  Hudspeth stated that when he
refused, Sadeghian physically threatened him and then filed this lawsuit.  Sadeghian
denied ever threatening Hudspeth and testified that he originally asked
Hudspeth to return only the money he had given him to give to Vasquez but that
after the property was demolished because it had not been repaired, he
increased his demand.

The
jury believed Hudspeth’s version of events and found that Sadeghian and
Hudspeth did not have a written agreement, that Sadeghian committed fraud
against Hudspeth, and that Sadeghian converted Hudspeth’s personal property. 
The jury found that Hudspeth’s damages were $10,000 for fraud and $6,000 for conversion. 
The jury further found that Sadeghian’s suit was “frivolous, baseless, or
groundless” and had been brought in bad faith or for purposes of harassment and
determined that $50,000 would compensate Hudspeth for Sadeghian’s filing of the
suit.  The jury also found that $20,210.53 was a reasonable fee for Hudspeth’s
attorney in defending against Sadeghian’s frivolous, baseless, or groundless
lawsuit, that $10,000 was a reasonable fee if Sadeghian appealed to the court
of appeals, and that another $10,000 was a reasonable fee if Sadeghian appealed
to the Supreme Court of Texas.  The trial court’s judgment conformed to the
jury’s findings, awarding Hudspeth $10,000 for fraud, $6,000 for conversion,
$50,000 for Sadeghian’s “frivolous, baseless, or groundless litigation,” $20,210.53
in attorney’s fees, plus $10,000 contingent appellate attorney’s fees if
Sadeghian appealed, and an additional $10,000 if Sadeghian filed a petition for
review with the Supreme Court.  Sadeghian now appeals.

Analysis

Jurisdiction

In
his first point, Sadeghian argues that the sum of Hudspeth’s counterclaims
exceeded the jurisdictional limits of the county court and that the county
court therefore did not have jurisdiction over the counterclaims.  He argues
that this court should therefore reverse the county court’s judgment and
dismiss Hudspeth’s claims with prejudice.

In
an appeal from a justice court to a county court, the jurisdiction of the
county court is confined to the jurisdictional limits of the justice court.[3] 
A justice court has jurisdiction of civil matters in which the amount in
controversy—that is, the value of the case at the time of filing—is not more
than $10,000, exclusive only of interest.[4]  When jurisdiction is
properly acquired, no subsequent event in the case will defeat that jurisdiction.[5] 
Accordingly, when the original suit is within the jurisdictional limits of the
court and subsequent amendments seek only additional damages that accrued because
of the passage of time, the court does not lose jurisdiction even if the amendment
increases the amount in controversy above the jurisdictional limits of the
court.[6]  If the party’s “original
and amended petitions do not affirmatively demonstrate an absence of
jurisdiction, a liberal construction of the pleadings in favor of jurisdiction
is appropriate.”[7]

Sadeghian
argues that Hudspeth sought $10,000 for fraud, $6,000 for conversion, $50,000
as sanctions for filing a frivolous suit, and $19,230 in attorney’s fees, also
as sanctions.  We first note that in his discussion of this point, Sadeghian
fails to cite any part of the record where we may find support for his
assertions.[8] 
Because this point concerns jurisdiction, however, we searched the record to
find Hudspeth’s pleadings.[9]  From our review we have
determined that although the jury awarded those amounts, Hudspeth’s counterpetition
did not allege damages in those amounts.

In
Hudspeth’s original counterpetition, he asserted a claim for common law fraud,
and he asked for attorney’s fees “in the amount of not less than $5,000.00” as a
sanction for Sadeghian’s filing what Hudspeth alleged was a “frivolous,
baseless, and groundless lawsuit in bad faith.”  He prayed for actual damages,
court costs, prejudgment and postjudgment interest, exemplary damages,
sanctions, and attorney’s fees.  But other than the $5,000 in sanctions,
Hudspeth did not assert any specific amount of damages or relief sought.

The
Supreme Court of Texas has held that “the omission of any allegation regarding
the amount in controversy from plaintiff’s petition [does] not deprive the
court of jurisdiction, but [is] instead a defect in pleading subject to special
exception and amendment.”[10]  The Peek court
held that although the original petition in that case was defective for failing
to allege the amount in controversy, the petition was nevertheless sufficient
to invoke the jurisdiction of the trial court.[11]

This
case differs from Peek in that Hudspeth did include one allegation
regarding the amount in controversy:  $5,000 in sanctions.  This amount was within
the court’s jurisdiction.  But he made no allegations in his original counterpetition
regarding the amount in controversy relating to his other claims.  Because this
counterpetition did not affirmatively negate the absence of jurisdiction, the justice
court correctly construed the pleadings in favor of jurisdiction.[12]
 And because the justice court properly acquired jurisdiction over Hudspeth’s
counterclaim, Hudspeth’s subsequent amendment of his pleadings did not divest
the court of jurisdiction.[13]

Hudspeth
amended his pleadings in the county court, but these pleadings did not
demonstrate that the county court lacked jurisdiction over the new claims.  In
his second amended counterpetition, Hudspeth added a claim for conversion, for
which he alleged damages of $6,000, and did not assert any specific amount of
damages on his fraud claim.  Hudspeth also sought as a sanction his attorney’s
fees that had accrued during the course of litigation, as well as sanctions for
Sadeghian’s pursuit of a groundless lawsuit—amounts that were premised on the passage
of time due to the ongoing litigation and were therefore within the trial court’s
jurisdiction.[14]  Thus, although the jury
found and the judgment awarded damages of more than $10,000, contrary to
Sadeghian’s argument, Hudspeth did not plead damages over the court’s
jurisdictional limit.  Accordingly, we hold that Hudspeth’s pleadings did not
negate the existence of jurisdiction.

Although
the trial court rendered a judgment in excess of its jurisdictional limits,
Sadeghian makes no argument about the court’s lack of authority to do so.  His
only argument relates to the trial court’s jurisdiction to hear the claims in
the first place.  He makes no arguments supported by authority that even if the
trial court had jurisdiction to hear the claims, it had no authority to render
a judgment in excess of its jurisdiction limits.  Nevertheless, because an
amount of a judgment in excess of the trial court’s jurisdictional limits is
void, we consider whether the trial court’s judgment exceeded its jurisdictional
limits.[15]

As
stated above, in his second amended counterclaim, Hudspeth sought two additional
categories of damages, both of which he alleged were incurred while the
litigation was proceeding.  First, he pled for $6,400 for loss of employment
opportunities caused by the ongoing litigation.  Second, he asked to be awarded
as sanctions the attorney’s fees that he incurred and that had continued to
accrue in defending against Sadeghian’s groundless lawsuit.  The attorney’s
fees accrued during the litigation and the employment opportunities lost
because Hudspeth was required to spend time away from work in order to “handle
Sadeghian’s . . . baseless litigation” were damages that accrued because of the
passage of time during the litigation period.  Therefore, even if they caused
the amount in controversy to surpass the jurisdictional limits of the court,
the trial court had jurisdiction to hear the claims and to render judgment on
those claims in excess of its jurisdictional limits.[16]

Hudspeth
also asserted a claim for conversion, based on his allegation that he had left
materials at a property that Sadeghian purchased in foreclosure and that
Sadeghian had refused to let him retrieve the materials.  The trial court
awarded Hudspeth damages for $6,000 on this claim in accordance with the jury’s
verdict.  The trial court’s award of fraud damages of $10,000 was the maximum
amount of damages that could be awarded within the trial court’s jurisdiction
(exclusive of interest and amounts due to the passage of time), and
consequently this amount of conversion damages was rendered in excess of the
trial court’s jurisdictional limit.[17]  Because this part of the
award was not due to the passage of time, we hold that this part of the
judgment in excess of the trial court’s jurisdictional limit is void. 
Accordingly, we sustain Sadeghian’s first point as to this claim, and we modify
the trial court’s judgment in part to exclude the award of $6,000 on Hudspeth’s
conversion claim.[18]  We overrule the
remainder of Sadeghian’s first point.

Conversion

In part
of his second point, Sadeghian argues that the trial court should not have
submitted Hudspeth’s counterclaim for conversion to the jury.  Because we
modify the judgment to delete all damages for conversion, we overrule this
portion of his second point as moot.  Similarly, in Sadeghian’s fifth point, he
argues that the evidence does not support the jury’s answers to the questions
regarding Hudspeth’s conversion claim.  We likewise overrule this point as
moot.

Breach
of Contract

In
his third point, Sadeghian asserts that the evidence at trial proved the
existence of a contract, and therefore the jury’s answers to the questions on
his breach of contract claim are erroneous.  Under this point, Sadeghian first states
that a contract is established when an offer is accepted, accompanied by
consideration.  He then argues that Hudspeth established “that he performed
pursuant to the handwritten contract” when he testified that he cashed Sadeghian’s
check in order to give the money to Vasquez and that he gave the money to
Vasquez as he completed repairs or incurred expenses.  But this testimony does
not indicate that Hudspeth accepted the offer alleged by Sadeghian.  Reviewing
the testimony relied upon by Sadeghian, the record actually shows that Hudspeth
testified that he expressly refused to agree to the terms of the handwritten
contract and that he agreed to take the check and pass the money on to Vasquez
solely as a favor to Sadeghian.[19]

Sadeghian
then states that written contracts may consist of multiple documents, and he
argues that the handwritten contract and the check, executed at or near the
same time for the same purpose and in the course of the same transaction, “should
be considered together for what they clearly are[—]a contract.”  But Sadeghian
fails to explain how considering these documents together shows the existence
of a contract.  He does not argue that these two documents together contain all
the material terms necessary for a contract, and even if the handwritten
document contained all the necessary terms, Sadeghian points to no evidence
showing that Hudspeth accepted the offer.

Finally
under this point, Sadeghian states that an offer may be accepted by conduct,
and he argues that he “was certainly justified in relying upon the conduct of
[Hudspeth], for he had been a contractor for some 38 years . . . and to hear
him utter otherwise is clearly unavailing.” [Ellipses in original.]  While Sadeghian’s
exact argument here is unclear, to the extent that he argues that the evidence
shows that Hudspeth accepted an offer by conduct, he does not point out what
acts of Hudspeth show that he accepted any offer from Sadeghian.  The only
evidence Sadeghian directs us to is the statement of Hudspeth that he accepted
the check from Sadeghian.  As we have noted, Hudspeth explained that he cashed
the check and passed the money to Vasquez as a favor to Sadeghian after
expressly refusing to agree to enter into the contract offered by Sadeghian.  In
other words, while the evidence could support a finding that the parties had an
oral agreement for Hudspeth to hold the funds and distribute them to Vasquez, the
evidence pointed out by Sadeghian does not establish as a matter of law the
existence of an agreement for Hudspeth to manage Vasquez’s work on the terms
alleged by Sadeghian.[20]  Accordingly, we
overrule Sadeghian’s third point.

Fraud

Although
Sadeghian does not reference Hudspeth’s fraud claim in the statement of his second
point and does not include any legal analysis about whether Hudspeth’s fraud
claim as pled in the county court was a new ground of recovery, he does mention
in one sentence under that point that Hudspeth altered his fraud claim from the
one pled in the justice court.[21] 
Civil procedure rule 574a provides that on appeal to a county court from a
justice court, “[e]ither party may plead any new matter in the county . . .
court which was not presented in the court below, but no new ground of recovery
shall be set up by the plaintiff, nor shall any . . . counterclaim be set up by
the defendant.”[22]  While a new ground of
recovery may not be added on appeal, additional causes of action, claiming the
same damages and based on the same conduct alleged in the justice court, are
not new grounds of recovery in violation of rule 574a.[23]

The
conduct of Sadeghian on which Hudspeth based his fraud counterclaim in the
county court was the same conduct he alleged in his pleadings in the justice
court.  Hudspeth always asserted that Sadeghian was falsely claiming that
Hudspeth had agreed to a written contract and that Sadeghian brought his breach
of contract claim only to harass Hudspeth.  Accordingly, to the extent that
Sadeghian argues that the trial court should not have submitted the fraud
question to the jury because it was a new ground of recovery not asserted in
the justice court, we overrule the remainder of Sadeghian’s second point.

In
his fourth point, Sadeghian argues that “[t]he evidence does not support the
jury’s answers to questions regarding fraud.”  Under this point, he first
states that Hudspeth cannot show any evidence of the elements of fraud “in any
of his many and varied pleadings.”  But Hudspeth was not required to provide evidence
of fraud in his pleadings.[24]

To
the extent that Sadeghian argues that the evidence produced at trial is
insufficient to support a fraud finding, his arguments under this point are
inadequately briefed.[25]  Sadeghian argues that
Hudspeth relied on Sadeghian’s filing of the lawsuit to establish fraud but
that communications made in the course of a judicial proceeding will not serve
as the basis for an action for libel or slander.  But Hudspeth did not sue Sadeghian
for libel or slander, and therefore this argument has no relevance to Sadeghian’s
sufficiency complaint.

Sadeghian
next argues that Hudspeth “tried to argue that the actionable representation
was an amorphous belief that all [Hudspeth] was to do was pass the money along”
and that such belief “will not satisfy the standards for justifiability
established by the courts of this state.”  Although Sadeghian does not
elaborate on his argument, we understand Sadeghian to mean that Hudspeth
believed that Sadeghian gave him a check only to pass on to Vasquez rather than
to form an offer to contract (which Sadeghian contends Hudspeth accepted,
forming the basis of Sadeghian’s breach of contract suit) but that Hudspeth’s
belief was not justified.  But Sadeghian does not explain why Hudspeth’s belief
could not be justifiable.  Sadeghian states that a person may not justifiably
rely on a representation “if there are ‘red flags’ indicating such reliance is
unwarranted,” but he does not explain what “red flags” made Hudspeth’s reliance
unjustified and points to nothing in the record from which we may conclude that
Hudspeth’s reliance was unjustified.

Finally,
Sadeghian argues that Hudspeth did not show any evidence of causation because
Hudspeth’s “claimed injuries arise only from the filing of this case,” and,
therefore, Sadeghian is covered by the litigation privilege.  But the case he
cites for this proposition held that “[c]ommunications in the due course of a
judicial proceeding will not serve as the basis of a civil action for libel or
slander.”[26]  Again, Hudspeth did not
sue Sadeghian for libel or slander.  To the extent that Sadeghian attempts to
argue that he is shielded by the litigation privilege under which attorneys
cannot be held liable on a cause of action for wrongful litigation conduct, such
protection extends to his attorney, not to him.[27]
 Sadeghian makes no other argument for why the evidence does not support the
jury’s fraud finding.  He cites to no applicable case law suggesting that his
actions cannot support a fraud claim.[28]  Accordingly, we
overrule Sadeghian’s fourth point.

Sanctions

In
his sixth point, Sadeghian asserts that “[t]he evidence, and procedures used in
this case, do not support, or warrant, the jury’s answers to questions
regarding the filing of a frivolous, baseless, or groundless lawsuit in bad
faith or for the purposes of harassment.”  In a section heading, he asserts
that Hudspeth did not establish all of the elements necessary for sanctions.

Sadeghian’s
argument under this point, however, does not address the evidence produced by
Hudspeth at trial and why Sadeghian believes it did not show good cause for an
award of sanctions, nor does he discuss what a party must show to be entitled
to sanctions.  Rather, Sadeghian argues that before awarding sanctions, the
trial court must hold a pretrial evidentiary hearing “to make the necessary
factual determinations about the party’s or attorney’s motives and credibility”
and that without such a hearing, “the trial court has no evidence before it to
determine that a pleading was filed in bad faith or to harass.”  Sadeghian
seems to be impliedly arguing that a trial court may consider only evidence
produced at a pretrial sanctions hearing and that evidence produced at trial
may not be used to satisfy the good cause requirement for a sanctions award. 
Sadeghian concludes by stating (with no citation to authority)[29] that the issue’s submission
to the jury was a process calculated to lead to improper findings.

We
review a trial court’s order of sanctions for abuse of discretion.[30]  A trial court’s
imposition of sanctions constitutes an abuse of its discretion when the court
based its order on an erroneous view of the law or a clearly erroneous
assessment of the evidence.[31] 
Any error in imposing sanctions, however, will not be set aside on appeal
unless the error probably caused the rendition of an improper judgment or
probably prevented the appellant from properly presenting the case on appeal.[32]  And although a
trial court commits error if it submits a question of law to the jury, “the
error is harmless if the jury answers the question of law correctly or if it
can be deemed immaterial and disregarded by the trial court.”[33]

Texas
law provides more than one basis for sanctioning a party’s conduct.  In
addition to a trial court’s inherent authority to sanction parties for bad
faith abuses of the judicial process,[34]
several Texas statutes provide trial courts with the authority to sanction
parties for various abusive behaviors.[35] 
If a party files pleadings that lack a reasonable basis in fact or law,
chapters 9 and 10 of the civil practice and remedies code and civil procedure
rule 13 each provide a basis on which a trial court may sanction a party for
filing the pleadings.[36]

Sadeghian
is correct that in some cases, a party may waive its right to sanctions if the
party does not obtain a pretrial ruling on the matter.  A party waives any
claim for sanctions based on pretrial discovery abuses if the party does not
obtain a pretrial ruling on the discovery disputes.[37]  But this case does not
involve discovery abuses, and the trial court was within its discretion to
postpone a determination of whether the suit was groundless and brought in bad
faith or for purposes of harassment until after the parties presented evidence
at trial about Sadeghian’s claims and his purpose in filing suit.[38]  For sanctions
based on conduct other than discovery abuses that the party seeking sanctions
knew about pretrial, courts of appeals have routinely upheld sanctions awarded
during or after trial.[39]

Here,
both sides presented evidence at trial about the events giving rise to the suit
and about Sadeghian’s motive in filing suit against Hudspeth.  We therefore
find unpersuasive Sadeghian’s argument that because the trial court did not
hold a pretrial hearing, it had no evidence before it from which it could
determine whether sanctions were appropriate.

Although
Sadeghian cites no authority holding that the jury may not make the necessary
findings about his motives in filing suit, we note that the Supreme Court of
Texas has held that the question of whether a suit under the Deceptive Trade
Practices Act is groundless is a question of law for the trial court.[40]  Courts have also
held that whether a suit was brought in bad faith or for purposes of harassment
are questions for the trial court to determine after hearing evidence and
making findings based on that evidence.[41] 
Thus, the trial court in this case should not have submitted the question to
the jury.  Our analysis does not end here, however, because we generally do not
reverse a judgment for trial court error if that error was harmless.[42]

At
trial, both Hudspeth and Sadeghian presented testimony about the events giving
rise to the lawsuit.  For his part, Hudspeth testified that Sadeghian asked him
to sign a handwritten agreement providing that, in exchange for being paid
$200, he would manage Vasquez’s work on the property.  Hudspeth expressly
declined the offer, refusing to supervise Vasquez’s work for that amount of
money.  But later, after receiving phone calls from both Sadeghian and Vasquez
about disagreements they had about payments and the speed of the work, he
agreed as a favor to take some money from Sadeghian and pass it on to Vasquez
as an intermediary.  Hudspeth received $3,000 from Sadeghian, most of which he
passed on to Vasquez as Vasquez completed repairs or incurred expenses, and the
remainder of which he attempted to return to Sadeghian.

At
some point soon after Vasquez began work on the property, Sadeghian kicked
Vasquez off the job.  Hudspeth tried to give the rest of the money that he had
received for Vasquez back to Sadeghian, but Sadeghian refused to take it. 
Instead, Sadeghian demanded that Hudspeth pay him $8,900—the amount for which
Vasquez had contracted with Sadeghian to do the work on the property—plus the
money that Hudspeth had already passed on to Vasquez on behalf of Sadeghian.  After
Sadeghian made several unsuccessful phone calls to Hudspeth demanding payment,
he showed up at Hudspeth’s house with his son-in-law and once again demanded
the money.  Sadeghian threatened Hudspeth physically and threatened to take his
house and possessions and make Hudspeth’s life “a living hell” if he did not
pay Sadeghian the money he demanded.  Hudspeth refused to pay, and subsequently
Sadeghian filed this suit claiming that Hudspeth had breached the very contract
that Hudspeth had refused to sign.  Then, a few months before the jury trial in
the county court, Sadeghian ran into Hudspeth outside the courthouse and told
Hudspeth that he should settle because Sadeghian would not stop the litigation.

Hudspeth
also presented testimony from Darrel Bartkowiak, Sadeghian’s former employee. 
Bartkowiak testified that in the course of his employment, he had been asked “to
embellish work that had been done or that was going to be done on some
insurance,” “to inflate estimates on some . . . properties,” and once to put a
property in his name “to claim that [Sadeghian] was an innocent owner of a
particular property that the City of McKinney was going to go after him for
some substandard work that was unpermitted.”

Bartkowiak
also testified about his knowledge of Sadeghian’s “practice of filing lawsuits
as a form of intimidation.”  He testified that Sadeghian had “bragged on more
than one occasion” about using the legal system “to his advantage to gain [the]
upper hand on individuals and crush individuals in regard to the fact that he
had so much money that he could do this forever and that he just ran the clock
on most people with legal bills and legal proceedings.”  He stated that
Sadeghian told him that he filed lawsuits as a way to make money.

This
evidence is sufficient to support a finding that Sadeghian’s pleadings were
filed in bad faith or for purposes of harassment.[43] 
The evidence also supports a conclusion that Sadeghian’s suit had no basis in
law and was not warranted by a good faith argument for the extension,
modification, or reversal of existing law, in other words, that the suit was
groundless.[44]  Accordingly, because
the evidence supports the judgment, the error in submitting the question to the
jury was harmless.[45]  And we point out that
Sadeghian does not complain either that the judgment did not specify the good
cause on which the sanctions were based (nor did he object on that ground in
the trial court)[46] or that the sanctions
imposed were not appropriate.[47]  We therefore expressly
do not consider whether there is a direct relationship between the offensive
conduct and the sanction imposed, whether it is excessive,[48]
or whether the trial court’s failure to specify the particulars of a good cause
for sanctions was harmful error.[49]  We further note that
although Hudspeth sought sanctions by way of a counterclaim[50]
and that the trial court referred to the sanctions as “damages,” Sadeghian does
not argue that this procedure was not the proper vehicle for pursuing sanctions
or that sanctions may not be awarded as damages.[51] 
We overrule Sadeghian’s sixth point.

Sadeghian’s
seventh and final point is that the evidence does not support the jury’s answer
regarding attorney’s fees.  Hudspeth’s attorney testified about his level of experience,
his hourly rate, and the amount of time that he spent on the litigation.  He
testified that the hourly rate he was charging Hudspeth was reasonable and was
in fact lower than what he usually charged.  He testified that that it was
customary for an attorney in Denton County to bill at that rate for a person
with the skill and judgment of his experience in this type of subject matter. 
And he introduced his billing records, which stated the work he had performed on
the case and the amount of time he had spent on each task performed.  This
evidence supports the finding as to the reasonableness of the requested
attorney’s fees.[52]

Sadeghian’s
analysis under this point, however, does not challenge the sufficiency of the
evidence to support the jury’s finding.  Instead, he argues that Hudspeth is
not entitled to attorney’s fees because attorney’s fees are not recoverable on
tort claims and Hudspeth did not segregate his attorney’s fees among his claims
and defenses.

Hudspeth
did not claim a right to his attorney’s fees based on his tort counterclaims. 
Instead, Hudspeth sought his attorney’s fees as additional sanctions on the
ground that Sadeghian’s suit was frivolous and groundless and brought for
purposes of harassment.[53]  The trial court awarded
the fees on that basis.  Sadeghian does not challenge the award of attorney’s
fees on this ground.  Accordingly, we overrule Sadeghian’s seventh point.

Conclusion

Having
sustained Sadeghian’s first point in part, we modify the trial court’s judgment
to exclude the $6,000 damages award on Hudspeth’s conversion claim.  Having
overruled the remainder of Sadeghian’s issues, we affirm the trial court’s
judgment as modified.

 

PER CURIAM

 

PANEL: 
DAUPHINOT,
GARDNER, and WALKER, JJ.

 

DELIVERED:  August 30, 2012









[1]See Tex. R. App. P. 47.4.





[2]Tex. R.
Civ. P. 13; Tex. Civ. Prac. & Rem. Code Ann. §§ 9.001–.014, 10.001–.006
(West 2002).





[3]Crumpton v. Stevens, 936 S.W.2d 473,
476 (Tex. App.—Fort Worth
1996, no writ).





[4]Tex. Gov’t Code Ann. § 27.031 (West Supp. 2012); United
Servs. Auto. Ass’n v. Brite, 215 S.W.3d 400, 401 (Tex. 2007) (referring to the
“amount in controversy” as the value of the case at filing).





[5]Flynt v. Garcia, 587 S.W.2d 109, 109–10 (Tex. 1979).





[6]Id.; Cont’l Coffee Prods. Co. v.
Cazarez, 937 S.W.2d 444, 449 (Tex. 1996).





[7]Cont’l Coffee Prods., 937 S.W.2d at
449.





[8]See Tex. R. App. P. 38.1(i) (requiring
argument to be supported by appropriate citations to the record); see also Fredonia State Bank v. Gen. Am. Life Ins. Co.,
881 S.W.2d 279, 284 (Tex. 1994) (stating that appellate court has discretion to
waive point due to inadequate briefing); Devine v. Dallas County, 130
S.W.3d 512, 513–14 (Tex. App.—Dallas 2004, no pet.) (holding that when a party
fails to adequately brief a complaint, he waives the issue on appeal).





[9]See
Tex. Ass’n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 443–44 (Tex.
1993) (considering whether the trial court had jurisdiction over the case and
stating that subject matter jurisdiction cannot be waived); Lawrence v. City
of Wichita Falls, 122 S.W.3d 322, 326 (Tex. App.—Fort Worth 2003, pet.
denied) (“Subject matter jurisdiction cannot be waived and may be raised by the
court on its own motion or for the first time on appeal.”)





[10]Peek v. Equip. Serv. Co. of San Antonio, 779 S.W.2d 802, 805 (Tex. 1989).





[11]Id.





[12]See Cont’l Coffee Prods., 937
S.W.2d at 449.





[13]See
Flynt, 587 S.W.2d at 109–10.





[14]See
Cont’l Coffee Prods. Co., 937 S.W.2d at 449; see also Crumpton, 936
S.W.2d at 477 (holding that the county court erred by denying Crumpton’s
attorney’s fees on the ground that the fees were in excess of justice court’s
jurisdictional limits because the fees were incurred in prosecuting the suit in
the county court).





[15]Kendziorski
v. Saunders, 191 S.W.3d 395, 410 (Tex. App.—Austin 2006, no pet.).





[16]See
Cont’l Coffee Prods. Co., 937 S.W.2d at 449; Crumpton, 936 S.W.2d at
477.





[17]See
Kendziorski, 191 S.W.3d at 410 (holding that the portion of the judgment in
excess of the trial court’s jurisdictional limit was void); N. Am. Ins. Co.
v. Jenkins, 184 S.W. 307, 308 (Tex. Civ. App.—Galveston 1916, no writ)
(reforming the trial court’s judgment to omit the amount exceeding the trial
court’s jurisdiction).





[18]See
Oldner v. Medlock, No. 05-10-00848-CV, 2012 WL 114192, at *1 (Tex. App.—Dallas
Jan. 12, 2012, no pet.) (mem. op.) (holding that the fact that county court’s
judgment included compensatory and exemplary damages exceeding its
jurisdictional limits “does not render its entire judgment void or deprive the
county court of jurisdiction over the case” and that “only that portion of the
county court’s judgment exceeding the jurisdictional limit of $10,000 exclusive
of interest is void”); Kendziorski, 191 S.W.3d at 410; Jenkins,
184 S.W. at 308; cf. H & S Supply Co., Inc. v. Oscar Renda
Contracting, Inc., No. 02-02-00093-CV, 2003 WL 1897584, at *3 (Tex. App.—Fort
Worth Apr. 17, 2003, no pet.) (mem. op.) (rendering judgment dismissing the
appellee’s counterclaim for lack of jurisdiction because the evidence at trial
showed that the amount in controversy on the appellee’s only counterclaim
exceeded the jurisdictional limits of the court).





[19]See
Brown v. Sabre, Inc., 173 S.W.3d 581, 588 (Tex. App.—Fort Worth 2005, no
pet.) (noting that contract formation requires “an offer, an acceptance, a
meeting of the minds, each party’s conceding to the terms, and an execution and
delivery of the contract with the intent that it be mutual and binding”).





[20]See Dow Chem. Co. v. Francis,
46 S.W.3d 237, 241 (Tex. 2001) (“When a party attacks the legal sufficiency of
an adverse finding on an issue on which she has the burden of proof, she must
demonstrate on appeal that the evidence establishes, as a matter of law, all
vital facts in support of the issue.”).





[21]See
Tex. R. App. P. 38.1(i); Devine, 130 S.W.3d at 514.





[22]Tex.
R. Civ. P. 574a.





[23]See
Harrill v. A.J.’s Wrecker Serv., Inc., 27 S.W.3d 191, 195 (Tex. App.—Dallas
2000, pet. dism’d w.o.j.).





[24]See Tex. R. Civ. P. 85, 97 (describing
the requirements for a defendant’s answer and counterclaims).





[25]See
Tex. R. App. P. 38.1(i); Fredonia State Bank, 881 S.W.2d at 284.





[26]James v. Brown, 637 S.W.2d 914, 916
(Tex. 1982).





[27]See
Alpert v. Crain, Caton & James, P.C., 178 S.W.3d 398, 408 (Tex.
App.—Houston [1st Dist.] 2005, pet. denied) (holding that acts taken by an
attorney to facilitate the rendition of legal services to a party were not a
basis for a fraud claim against the attorney by a third party absent legal
privity or an independent duty to and justifiable reliance by the third party);
Renfroe v. Jones & Assocs., 947 S.W.2d 285, 288 (Tex. App.—Fort
Worth 1997, writ denied) (“Under Texas law, attorneys cannot be held liable for
wrongful litigation conduct.”).





[28]See
Tex. R. App. P. 38.1(i); Tello v. Bank One, N.A., 218 S.W.3d 109, 116
(Tex. App.—Houston [14th Dist.] 2007, no pet.) (stating that “we know of no
authority obligating us to become advocates for a particular litigant through
performing [his] research and developing [his] argument for [him]”) (citation
omitted).





[29]See
Tex. R. App. P. 38.1(i).





[30]Unifund
CCR Partners v. Villa, 299 S.W.3d 92, 97 (Tex. 2009).





[31]Monroe
v. Grider, 884 S.W.2d 811, 816 (Tex. App.—Dallas 1994, writ denied).





[32]See Tex. R. App. P. 44.1(a); Bloom
v. Graham, 825 S.W.2d 244, 247 (Tex. App.—Fort Worth 1992, writ denied) (holding
that the trial court’s failure to comply with the requirements of rule 13 was harmless
under the circumstances); see also Bloodworth v. Aden, No. 01-05-00796-CV,
2007 WL 1845111, at *3 (Tex. App. —Houston [1st Dist.] June 28, 2007, pet.
denied) (mem. op.) (holding that under the circumstances, the trial court’s
submission of the issue of sanctions to the jury was harmless).





[33]Grohman
v. Kahlig, 318 S.W.3d 882, 887–88 (Tex. 2010) (deciding
that “[t]he trial court committed harmless error by submitting the question to
the jury because the jury answered it as the trial court should have”); see
also McCain v. NME Hospitals, Inc., 856 S.W.2d 751, 757 (Tex. App.—Dallas 1993, no writ) (noting that
the trial court did not describe good cause or the particulars required by rule
13 in its sanction orders and examining the record to determine if it would
support the trial court’s judgment).





[34]See
In re Bennett, 960 S.W.2d 35, 40 (Tex. 1997) (“A court has the inherent
power to impose sanctions on its own motion in an appropriate case.”); Eichelberger
v. Eichelberger, 582 S.W.2d 395, 398–99 (Tex. 1979) (recognizing that a
court has inherent power “which it may call upon to aid in the exercise of its
jurisdiction, in the administration of justice, and in the preservation of its
independence and integrity”); Howell v. Tex. Workers’ Comp. Comm’n, 143
S.W.3d 416, 446 (Tex. App.—Austin 2004, pet. denied) (noting that “[e]ven in
the absence of an applicable rule or statute, a court has the inherent
authority to sanction parties for bad-faith abuses”).





[35]See
Tex. R. Civ. P. 13, 215.2; Tex. Bus. & Comm. Code Ann. § 17.50(c) (West
2011); Tex. Civ. Prac. & Rem. Code Ann. §§ 9.012, 10.004; see also Low
v. Henry, 221 S.W.3d 609, 614 (Tex. 2007) (“Chapters 9 and 10 of the Texas
Civil Practice and Remedies Code and rule 13 of the Texas Rules of Civil
Procedure allow a trial court to sanction an attorney or a party for filing motions
or pleadings that lack a reasonable basis in fact or law.”).





[36]Tex.
R. Civ. P. 13; Tex. Civ. Prac. & Rem. Code Ann. §§ 9.012, 10.004; see
also Low, 221 S.W.3d at 614.





[37]Remington
Arms Co., Inc. v. Caldwell, 850 S.W.2d 167, 170 (Tex. 1993).





[38]See, e.g., Gibson v. Ellis, 126 S.W.3d 324, 336 (Tex. App.—Dallas 2004, no pet.) (upholding a
trial court’s award of sanctions against Gibson and noting that the court had
taken judicial notice of the evidence presented at trial in determining whether
good cause existed to sanction Gibson).





[39]See,
e.g., Lane Bank Equip. Co. v. Smith S. Equip., Inc., 10 S.W.3d 308, 312
(Tex. 2000) (upholding a sanctions award based on a motion filed after judgment
by construing the motion as a motion to modify the judgment); Land v. AT &
S Transp., Inc., 947 S.W.2d 665, 668 (Tex. App.—Austin 1997, no writ)
(noting that trial court considered evidence presented at trial in determining
whether to award sanctions); Kutch v. Del Mar Coll., 831 S.W.2d 506, 509
(Tex. App.—Corpus Christi 1992, no writ) (holding that “Texas courts have
inherent power to sanction for bad faith conduct during litigation”).





[40]Donwerth
v. Preston II Chrysler-Dodge, Inc., 775 S.W.2d 634, 637 (Tex. 1989) (holding
that whether a claim is “groundless” under the deceptive trade practices act is
a question of law).





[41]See Rodriguez v. MumboJumbo, L.L.C., 347
S.W.3d 924, 926 (Tex. App.—Dallas 2011, no pet.) (noting that in determining
whether a party’s actions are sanctionable, the trial court acts as the fact
finder and as such weighs the evidence and makes reasonable deductions
therefrom); Randolph v. Walker, 29 S.W.3d 271, 278 (Tex.
App.—Houston [14th Dist.] 2000, pet. denied) (holding that the trial court did
not abuse its discretion in determining facts at the rule 13 hearing); N.Y.
Underwriters Ins. Co. v. State Farm Mut. Auto. Ins. Co., 856 S.W.2d 194,
205 (Tex. App.—Dallas 1993, no writ) (“Rule 13
requires the trial court to hold an evidentiary hearing to make the
necessary factual determinations about the motives and credibility of the
person signing the groundless petition.”) (emphasis added).





[42]See
Tex. R. App. P. 44.1.





[43]See
Pearson v. Stewart, 314 S.W.3d 242, 248 (Tex. App.—Fort Worth 2010, no
pet.) (stating that the term “harass” describes “words, gestures, and actions
that tend to annoy, alarm, and verbally abuse another person” and that “bad
faith” is “the conscious doing of a wrong for a dishonest, discriminatory, or
malicious purpose”); see also Monroe, 884 S.W.2d at 818–19
(noting the dishonest, discriminatory, or malicious purpose standard applies to
claims under the deceptive trade practices act and holding that a lesser
standard should apply for determining bad faith under rule 13 and “for rule 13
purposes, a party acts in bad faith when discovery puts him on notice that his
understanding of the facts may be incorrect and he does not make a reasonable
inquiry into the facts before filing a pleading”).





[44]See
Tex. R. Civ. P. 13.





[45]See,
e.g., Bloodworth, 2007 WL 1845111, at *3 (holding that the trial
court’s submission of the issue of sanctions to the jury was harmless).





[46]See
Bloom v. Graham, 825 S.W.2d 244, 247 (Tex. App.—Fort Worth 1992, writ
denied) (holding that the appellant presented nothing for review on his
argument that the trial court’s sanction order did not set out the particulars
for good cause because the record did not reflect that he filed any motion
requesting that the trial court be more specific as to good cause or its
particulars).





[47]Cf.
Low, 221 S.W.3d at 620–22 (stating that a sanction generally cannot be
excessive or assessed without appropriate guidelines and that “the absence of
an explanation of how a trial court determined that amount of sanctions when
those sanctions are especially severe is inadequate,” and concluding that the
trial court was within its discretion to award the sanctions, but, because the
court could not determine the basis of the $50,000 sanction in that case,
reversing and remanding “in the interest of justice to allow the parties to
present evidence responsive to our guidelines, if necessary, and to allow the
trial court to consider the amount of the  penalty imposed in light of the
guidelines in this opinion”).





[48]See
GTE Commc’ns Sys. Corp. v. Tanner, 856 S.W.2d 725, 731 (Tex. 1993) (stating
that the requirement that rule 13 sanctions be “appropriate” is the equivalent
of rule 215’s requirement that they be “just”); TransAm. Natural Gas Corp.
v. Powell, 811 S.W.2d 913, 917 (Tex. 1991) (holding that whether an
imposition of sanctions is “just” is measured by whether a direct relationship
exists between the offensive conduct and the sanction imposed and whether it is
excessive, that is, whether it more severe than necessary to satisfy its
legitimate purposes); Woodall v. Clark, 802 S.W.2d 415, 418 (Tex.
App.—Beaumont 1991, no writ) (affirming trial court’s sanction order because,
among other reasons, the appellant made no complaint on appeal that the trial
court’s order was unjust).





[49]See
Bloom, 825 S.W.2d at 247 (holding that the appellant presented nothing for
review on his argument that the trial court’s sanction order did not set out
the particulars for good cause because the record did not reflect that he filed
any motion requesting that the trial court be more specific as to good cause or
its particulars and that any error in the trial court’s failure to set out the
particulars of good cause in its sanctions order was harmless).





[50]See
N.Y. Underwriters Ins. Co., 856 S.W.2d at 205 (assuming without deciding
that a counterclaim for affirmative relief under rule 13 was an available method
to bring a motion for sanctions under that rule); see also Tex.
R. Civ. P. 71 (“When a party has mistakenly designated any plea or pleading,
the court, if justice so requires, shall treat the plea or pleading as if it
had been properly designated.”); State Bar of Tex. v. Heard, 603 S.W.2d
829, 833 (Tex. 1980) (“We look to the substance of a plea for relief to
determine the nature of the pleading, not merely at the form of title given to
it.”).





[51]See
Mantri v. Bergman, 153 S.W.3d 715, 717 (Tex. App.—Dallas 2005, pet. denied)
(stating that a request for sanctions is not an independent cause of action).





[52]See
Arthur Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex.
1997). (discussing factors to consider in determining the reasonableness and necessity
of attorney’s fees); see also In re A.S.M., 172 S.W.3d 710, 718
(Tex. App.—Fort Worth 2005, no pet.) (upholding award of
attorney’s fees as sanctions despite the lack of proof that the fees incurred
were either reasonable or necessary); Stites v. Gillum, 872
S.W.2d 786, 797 (Tex. App.—Fort Worth 1994, writ denied) (same).





[53]See Tex. R. Civ. P. 13; In re
A.S.M., 172 S.W.3d at 717–18 (noting that rule 13 “provides that a party may seek sanctions
against a party or counsel or both if the court determines that any pleading or
motion is groundless and brought either in bad faith or for the purpose of
harassment” and holding that under the circumstances, the trial court did not
abuse its discretion in awarding attorney’s fees as sanctions).